IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Patricia B. Scipio, | ) | C/A No.1:10-2550-JFA-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| Michael J. Astrue, Commissioner, | ) | |
| Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

This appeal from a denial of social security benefits is before the court for a Report and Recommendation ("Report") pursuant to Local Civil Rule 73.02(B)(2)(a) (D.S.C.). Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her claim for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") pursuant to Titles II and XVI of the Social Security Act respectively, 42 U.S.C. §§ 401–33, 1381–83f. The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether he applied the proper legal standards. For the reasons that follow, the undersigned recommends that the Commissioner's decision be reversed and remanded.

I.    Relevant Background

A.    Procedural History

On September 15, 2006,[1] Plaintiff filed an application for DIB and SSI under the Social Security Act ("the Act"), 42 U.S.C. §§ 401–433, 1381–1383c.  Tr. at 118–125.  In her applications, she alleged her disability began on January 21, 2005 based on her limited ability to use the right side of her body, trouble walking, inability to lift or carry, headaches, and body pain. Tr. 134.  Her application was denied initially and upon reconsideration. Tr. 64, 66, 68, 70, 83–8, 87–88. Plaintiff filed a request for a hearing, and Administrative Law Judge ("ALJ") William F. Pope held a hearing on May 12, 2009. Tr. at 27–60 (Hr'g Tr.).  The ALJ issued an unfavorable decision on July 28, 2009, finding that Plaintiff was not disabled within the meaning of the Act. Tr. 12–26. Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 1–5. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a Complaint filed on September 30, 2010. [Entry #1].

B.    Plaintiff's Background and Medical History

1.    Background

Plaintiff was 48 years old on her alleged onset date and 52 years old on the date of the ALJ's decision. Tr. at 24. She completed high school and attended a year of school

_____

[1] The ALJ and the parties indicate Plaintiff filed her application on August 22, 2006. *See* Tr. at 12, Pl.'s Br. at 1, Def.'s Br. at 1. The application of record is dated September 15, 2006. Tr. at 118–122.

thereafter, but did not complete her coursework. She has past relevant work ("PRW") performing clerical duties as an accounting tech at the South Carolina Department of Disabilities.  Tr. 31–33.

2.    Medical History

On January 20, 2015, Plaintiff was hit by a car while riding her bicycle and was taken to the emergency room ("ER"). Tr. 239, 242.  She sustained multiple injuries on the right side of her body and complained of pain in her right shoulder, forearm, thigh, and lower leg. Tr. 242.  A right forearm x-ray showed Plaintiff had a complete fracture of the proximal radius with one shaft width medial displacement of the distal radius. Tr. 258. A right lower leg x-ray showed Plaintiff had complete fracture of the proximal femur with multiple segmental components and medial displacement. Tr. 259. Bruce Burner, M.D., found she had a posterior right shoulder dislocation with drop of space below the right acromion. Tr. 242. He also found she had marked tenderness with prominence behind the shoulder joint and markedly tender right proximal forearm. *Id*. He found she had a foreshortened right leg that was pointed outward and a large, open wound over the right distal tibial region. *Id*. He administered medications and relocated Plaintiff's shoulder. Tr. 244. A subsequent x-ray showed good placement of the right humeral head. *Id*.

Plaintiff was transferred to McLeod Medical Center where Rakesh Chokshi, M.D., treated her. Tr. 341. He diagnosed right shoulder dislocation with successful reduction, right proximal third radius shaft fracture, closed right proximal third comminuted femur fracture, open right distal third tibia and fibula fracture, loss of consciousness, and

anemia. He recommended a complete CT evaluation and irrigation, debridement, and external fixation surgery. Tr. 343. A pelvic CT scan showed no sign of acute injury to the pelvis, heavily comminuted right femoral fracture visible only on scout images, left adnexal cyst measuring over three centimeters, and uterine fibroids. Tr. 325–26. Albert Gilpin, M.D., diagnosed Plaintiff with grade II open tibia/fibula fracture on the right, displaced diaphyseal radius fracture of the right arm, and displaced diaphyseal femur fracture of the right leg. Tr. 346. Plaintiff underwent irrigation and debridement of her open tibia/fibula fracture in the right leg, application of external fixator to her open tibial/fibula fracture in the right leg, and application of a distal femoral Steinmann pin in the right leg. Tr. 294–95.

X-rays of Plaintiff's right tibia/fibula showed external fixation anchored in the proximal and distal tibia with near anatomic alignment at the mid-tibia transverse fracture and comminuted tibular fracture. Tr. 317. An x-ray of Plaintiff's right foot was unclear due to the amount of casting plaster present, but showed no definite fractures and surgical hardware placed at ankle level. Tr. 318. An x-ray of Plaintiff's right ankle showed stabilization of the tibia and fibula, comminuted fractures by external pinning of the distal tibia with some angulation, and malalignment of the distal tibia and fibula. *Id*.

On January 21, 2005, Plaintiff underwent intramedullary nail fixation of the right femur shaft fracture, irrigation and excisional debridement of a compounding wound of the open tibial shaft fracture, intramedullary nail fixation of the right tibial shaft fracture, open reduction compression plate osteosynthesis of the right radius shaft fracture, and

examination of the right shoulder under anesthesia by Michael Mendes, M.D. Tr. 296.

Postoperatively, Dr. Mendes diagnosed closed segmental fracture of the right femur shaft,

open grade fracture of the right tibia shaft, closed fracture of the right proximal radius

shaft, and posterior right shoulder dislocation status post-reduction *Id*. Plaintiff

underwent x-rays in the operating room which showed intramedullary rod stabilizing

comminuted fracture of the proximal right femur. Tr. 310. Another x-ray showed open

reduction internal fixation of Plaintiff's right tibia. *Id*. A right shoulder x-ray was

negative and right forearm x-rays showed side plate and screw stabilization of fracture of

Plaintiff's proximal right ulna. Tr. 311.

On January 24, 2005, Plaintiff underwent a second-look irrigation and exploration

of the compounding wound of her left tibia open fracture with excisional debridement. Tr.

292. She also underwent an upper extremity MRI study, which showed: (1) diffuse edema

of the infraspinatous muscle, deltoid muscle, and subscapularis muscle, (2) partial

interstitial tear of the infraspinatous tendon, (3) rotator cuff interval tear of the

supraspinatous tendon near its insertion measuring two to three millimeters with no

significant retraction of the supraspinatous tendon, (4) marked distention of the anterior

and posterior capsule secondary to a hemarthrosis, (5) normal appearing anterior and

posterior labrum with no evidence of an osseous or cartilaginous bunkart lesion, (6) some

acromioclavicular joint arthrosis producing mild bony compromise of the supraspinatous

outlet, (7) two small two to three millimeter cysts at the musculotendinous junction of the

infraspinatous tendon (possibly post-traumatic), and (8) considerable edema in the anterior humeral head. Tr. 306.

On January 26, 2005, an x-ray of Plaintiff's right tibia and fibula showed slightly comminuted fractures involving the distal diaphysis and anterior displacement of the distal fracture fragments of the tibia and fibula. Tr. 272. On January 28, 2005, Plaintiff underwent: (1) open repair of her massive right shoulder rotator cuff tear (total avulsion), (2) reduction and repair of her biceps tendon dislocation in the right shoulder, (3) irrigation and debridement of her right ankle traumatic wound, and (4) application of vacuum assisted control. Tr. 287–88. Her medical records indicate a traumatic right shoulder rotator cuff tear and right ankle open wound. *Id*.

On February 2, 2005, Plaintiff underwent irrigation and debridement of her right ankle. Tr. 291. On February 7, 2005, Plaintiff underwent a split-thickness skin graft from her right thigh to right ankle. Tr. 283. On February 14, 2005, Dr. Mendes discharged Plaintiff, Tr. 277–78, and she was transferred to Healthsouth Rehabilitation Hospital. Tr. 365. Adora Matthews, M.D., diagnosed Plaintiff with (1) multi-trauma with multiple fractures post-emergent irrigation and debridement of a right tibial fracture, (2) closed segmental fracture of the right femoral shaft, (3) open grade 3A fracture of the right tibial shaft, (4) closed fracture of the right proximal radial shaft, (5) posterior right shoulder dislocation status post-reduction. Tr. 365. She also made the following diagnoses limited to her surgeries: intramedullary nail fixation of the right femoral shaft, irrigation and debridement of the compound fracture to the right open tibial shaft, extramedullary nail

fixation of the right tibial shaft, and open reduction/internal fixation with compression plate osteosynthesis of the right radial shaft. *Id*.

On February 23, 2005, Plaintiff presented to Dr. Mendes for an office appointment. Tr. 410. Plaintiff's right shoulder x-rays showed appropriate anchor fixation. *Id*. Forearm x-rays showed anatomic alignment of the proximal radius fracture and concentric radiocapitellar and ulnohumeral joints. *Id*. Right femur x-rays showed satisfactory position and alignment of the comminuted segmental shaft fracture with already abundant callus formation at the fracture site. *Id*. Right tibia x-rays showed anatomic alignment and stable internal nail fixation without evidence of complications. *Id*. Dr. Mendes found Plaintiff was stable and recommended continued non-weightbearing in her right shoulder and leg. *Id*. He recommended range of motion exercises and prescribed Percocet. *Id*.

On February 24, 2005, Dr. Matthews diagnosed multiple trauma with multiple fractures, closed segmental fracture of the right femoral shaft, open grade 3A fracture of the right tibial shaft, closed fracture of the right proximal radial shaft, posterior shoulder dislocation on the right status post-reduction, and multiple status post-multiple surgical repairs. Tr. 363. She discharged Plaintiff in stable condition with a manual wheelchair and hemi-walker. *Id*. She prescribed Augmentin, Soma, Hydrodiuril, Lopressor, Theragran, Protonix, Micro-K, Senokot, Valium, and Ambien. *Id*.

On March 9, 2005, Dr. Mendes removed the cast from Plaintiff's right leg. Tr. 409. He found she had three to four small punctate areas of granulation tissue at the

margin of the skin graft cauterized with silver nitrate. *Id*. He found Plaintiff could only passively dorsiflex her ankle to about neutral position due to the posterior muscular injury and secondary scarring. *Id*. Plaintiff had full range of motion in her knee with no tenderness in the pre-patellar area. *Id*. She had non-irritable right hip range of motion and could abduct her right shoulder actively to about 90 degrees and had excellent forearm motion. *Id*. Dr. Mendes applied a new short leg cast and recommended continued non-weightbearing and physical therapy. *Id*. He prescribed Percocet and noted that "[t]otal disability continue[d] indefinitely." *Id*.

On March 23, 2005, Dr. Mendes found Plaintiff had active abduction to 90 degrees and forward flexion to 100 degrees in her right shoulder. Tr. 408. He found she had non-irritable passive range of motion. *Id*. He found she had full flexion and near complete extension of the right elbow, nonirritable right hip range of motion, passive range of motion of the right knee with full extension to 100 degrees of flexion, a negative posterior drawer test, and nicely healed right leg skin graft. *Id*. He instructed her to advance to full weight bearing, perform resistance exercises, and use a walker boot on her right leg. *Id*. He recommended physical therapy and prescribed Percocet. Tr. 408.

On April 21, 2005, Dr. Mendes found Plaintiff had near complete active range of motion in her right shoulder, though she lacked about 10 to 20 degrees of internal rotation. Tr. 407. She had about 30 degrees of external rotation and near complete forward flexion and abduction. She had normal right elbow range of motion. *Id*. She lacked about ten degrees of terminal supination, but otherwise had normal wrist motion

and pronation range on the right. *Id*. She had non-irritable right hip range of motion. *Id*. She had full extension to 100 degrees of flexion in her right knee. *Id*. She had some tenderness over the patellar tendon entry point, a well-healed skin graft, and normal plantar sensation. *Id*. Right shoulder x-rays showed normal subacromial space and glenohumeral joint and implanted suture anchors. *Id*. Right forearm x-rays showed continued anatomic alignment, stable internal fixation, and good progression of primary bone healing. *Id*. Right femur x-rays showed stable, internal fixation with bridging callus consistent with union of the femoral shaft fracture site. *Id*. Right tibia x-rays showed early posterior lateral callus formation. *Id*. He indicated she should continue with full weight bearing as tolerated and discontinued her walker boot. *Id*. He recommended physical therapy and prescribed Percocet. *Id*.

On May 19, 2005, Dr. Mendes found she had near full active range of motion of the right shoulder with minimal pain and good range of motion of the right elbow, full extension, and flexion. Tr. 406.  She lacked about ten degrees of terminal supination. She had some mild shortening of her right leg. *Id*.  She had normal hip and knee range of motion and healed skin graft over the posterior ankle. *Id*.  A right tibia x-ray showed bridging callus posterior laterally at the tibia and healed fibula and non-displaced medial malleolus fractures. *Id*.  Right forearm x-rays showed solid union without evidence of complication of the proximal radial shaft fracture. *Id*. He recommended physical therapy and prescribed Percocet. *Id*.

On July 19, 2005, Plaintiff presented to Dr. Mendes complaining that she had "taken some falls" and had some pain in her shoulder, hip, and leg. Tr. 405. He found she had full active range of motion in her right shoulder, negative impingement test, and normal ranges of motion in her right hip, knee, and ankle. *Id*. X-rays showed healed comminuted segmental fractures of the right femur, right tibial shaft, traumatic wound over the posterior right ankle, and skin graft. *Id*. X-rays also showed concentric right glenohumeral joint, normal acromioclavicular joint, and suture anchors from the rotator cuff avulsion repair. *Id*. Dr. Mendes diagnosed instability secondary to quadriceps weakness and mild right leg limb discrepancy. *Id*. He indicated he "support[ed] her application for permanent disability" and prescribed Ultracet. *Id*.

On October 18, 2005, Dr. Mendes found Plaintiff had full active range of motion in her right shoulder, no internal and external rotation contracture, and normal subscapularis lift off test. Tr. 404. He found the compounding wound in the posterior aspect of her right ankle had healed without difficulty. *Id*. She had a healed skin graft, normal range of motion in her hip and ankle, and a one-half inch limb length discrepancy. *Id*. She lacked about 30 degrees of terminal supination in her right forearm, but had normal elbow flexion, extension, and pronation. *Id*. Shoulder x-rays showed suture anchors used to repair her massive rotator cuff avulsion without evidence of complication. *Id*. X-rays showed right femur segmental and right tibial shaft fractures. *Id*. X-rays of Plaintiff's right forearm showed a solid union of the right radius shaft fracture. *Id*. Dr. Mendes diagnosed healed right shoulder rotator cuff repair and prescribed a

one-half inch shoe lift. *Id.* He noted that no further treatment was required and gave no activity restrictions. *Id.*

On February 26, 2007, Robert Kukla, M.D., a state agency physician, reviewed the evidence and found Plaintiff could perform light work that did not require more than occasional overhead work with her right upper extremity. Tr. 436. He found that she could occasionally climb, balance, stoop, knee, crouch, and crawl. *Id.*

On May 2, 2007, Alfred G. Dawson, M.D., examined Plaintiff at the request of the Commissioner. Tr. 445–46. She complained of pain in her right thigh, hip, and arm. *Id.* at 445. She reported wearing a lift in her right shoe and intermittently using a cane. *Id.* Dr. Dawson found she ambulated effectively with a symmetrical gait. *Id.* She could perform fine gross motion and had pain in her right femur, tibia, and shoulder. *Id.* She had absent patellar and Achilles reflexes on the right, but her reflexes were otherwise normal. *Id.* She had numbness in her distal medial calf, negative straight leg raising tests bilaterally, weakness with dorsiflexion of the right ankle, and muscle atrophy in the right distal tibia. *Id.* She had no spasm or instability, but had swelling in her right thigh, and deformity in her right tibia. *Id.* Right shoulder x-rays showed multiple staples of the femoral head consistent with rotator cuff tear. *Id.* at 446. Right femur x-rays showed a fracture fragment with some shortening at the proximal medial femur which could cause pain "when running and long walking." *Id.* A cervical spine x-ray was unremarkable. *Id.* Dr. Dawson diagnosed status post-tibia and femur surgery with permanent muscle damage. *Id.*

On July 30, 2007, Edward Stahl, M.D., a state agency physician, reviewed the evidence and found Plaintiff could perform light work that did not require heavy repetitive use of foot pedals, climbing of ladders, ropes, or scaffolds, or more than occasional climbing of ramps and stairs, stooping, kneeling, crouching, and crawling. Tr. 448–55. He found she could not frequently use her right upper extremity for overhead work. *Id.* at 451.

On August 3, 2007, Plaintiff presented to Justin Baker, M.D., for complaints of depression, hypertension, and pain in her back, hip, arm, and lower leg. Tr. 495–96. Dr. Baker found she had a depressed mood. *Id.* at 496. He diagnosed uncontrolled depressive disorder and controlled hypertension and prescribed Lisinopril, Cymbalta, and Naproxen. *Id.*

On August 23, 2007, Al Harley, M.D., Ph.D., examined Plaintiff at the request of the Commissioner. Tr. 457–59. Plaintiff told Dr. Harley she had difficulty with pain and discomfort following her numerous orthopedic injuries after her accident. *Id.* at 457. She said her physical impairments made her dependent on other people. *Id.* She reported she was frequently moody, tense, nervous, anxious, and apprehensive and experienced loss of interest, enthusiasm, and feelings of helplessness and hopelessness. *Id.* She reported sleep disturbance and fatigue, but adequate appetite and concentration and fair self-esteem. *Id.* She reported she drove, walked, cooked and shopped some, and visited her daughter often. *Id.* Dr. Harley found she demonstrated no confusion or delusions. *Id.* He said she had no impairment in reality testing and could communicate. *Id.* Plaintiff reported living

12

with her two children and stopped working because she was laid off. Tr. 458. Dr. Harley found she was oriented as to time, date, and place. *Id.*  She had normal intelligence and good memory, knowledge, judgment, and common sense. *Id.*  She could do serial sevens and interpret and abstract in a relevant fashion. *Id.* She had numerous worries throughout the interview, but normal thought processes and emotion. *Id.*  Dr. Harley diagnosed major depression and assigned a GAF score of 37.4.[2] *Id.* at 458–459. He found that Plaintiff had major impairment in her ability to function vocationally and socially from a psychological standpoint. *Id.* at 459.

On September 7, 2007, Plaintiff presented to Dr. Baker with complaints of pain in her back, hip, arm, and lower leg. Tr. 492. She said Naproxen relieved her symptoms, but not for very long. *Id.* She also complained of depression. *Id.* Dr. Baker found she had a depressed mood and diagnosed improving depressive disorder and controlled hypertension. *Id.*  at 492–93. He prescribed Naproxen, Elavil, and Cymbalta. *Id.* at 493. On October 1, 2007, Edward Waller, Ph.D., a state agency psychologist, reviewed the evidence and found Plaintiff had an affective disorder resulting in moderate difficulties in social functioning and in maintaining concentration, persistence, or pace. Tr. 465, 472. He

---

[2] The GAF (Global Assessment of Functioning) is essentially a snapshot of an individual's functioning at a specific point in time. It is not a longitudinal indicator of functioning. A GAF score between 31 and 40 indicates an individual has "some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas such as work or school, family relations, judgement, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school)." Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders 34 (4th ed. text revision 2000).

conducted a mental residual functional capacity assessment and found that she could understand and remember short and simple instructions and could perform simple tasks for two plus hours without supervision. Tr. 476, 78.  He found she could maintain a regular work schedule, but might miss an occasional workday due to major depression. Tr. at 477–78.  He found that she would perform better in a low stress job setting that did not require ongoing interaction with the public. Tr. 478. He found she could make simple work related decisions, request assistance from others, and adhere to basic standards of hygiene and safety. *Id.*

On October 13, 2008, Plaintiff presented to Danielle Towns, M.D. Tr. 486.  She reported being out of her medications for some time.  She said her mood was "ok" when she was on Cymbalta, but she only took it intermittently for a while before she ran out. *Id.* She complained she had a depressed mood for "a while." *Id.* In addition, she stated she had very little interest in doing anything besides lying down all day and "fe[lt] bad for herself most of the time." *Id.* She complained of pain in her neck and right side of her body. *Id.* She said Naproxen and Elavil helped some. *Id.* She said that Dr. Baker informed her she had a "screw loose" in her lower right leg, but she did not want to undergo further surgeries. *Id.* Dr. Towns found she had decreased range of motion in her right extremities and a depressed mood. Tr. 487. Her diagnoses included dysmenorrhea, uncontrolled hypertension, stable anemia, joint pain in her lower leg, and cramps. *Id.*  Dr. Towns prescribed Cymbalta, Elavil, Lisinopril, Naproxen, and Provera. *Id.*

14

On October 18, 2007, Plaintiff saw Dr. Baker with complaints of pain in her back, hip, arm, and lower leg. Tr. 489. She said Naproxen relieved her symptoms, but did not last long enough. *Id*. She also complained of depression and hypertension. *Id*. Dr. Baker's diagnoses included lower leg joint pain, cramps, sleeplessness, depressive disorder, and controlled hypertension. Tr. 490. He prescribed Cymbalta, Elavil, Lisinopril, and Naproxen. *Id*.

On November 19, 2008, Plaintiff returned to Dr. Towns, who found she had decreased ranges of motion in her right extremities and shoulder. Tr. 483. She found she had appropriate mood and affect. Tr. 484. She diagnosed malaise, fatigue, stable depressive disorder, benign hypertension, and dysmenorrhea. *Id*.

On December 24, 2008, Plaintiff presented to Dr. Towns complaining of a dry cough. Tr. 480. Plaintiff reported she had not been taking Cymbalta because it was not covered by her insurance. *Id*. She said she had not noticed a change in her mood since stopping Cymbalta and said she did not think it helped her. *Id*. She reported she still had daily depressed mood and stayed in her house. *Id*. She reported minimal relief of her orthopedic problems with Naproxen and requested a different medication. *Id*. Dr. Towns found she had decreased range of motion in her right extremities secondary to pain and appropriate mood and affect. Tr. 481. Dr. Towns diagnosed cough, depressive disorder, benign hypertension, malaise, and fatigue. *Id*. She prescribed Celexa, hydrochlorothiazide, and Ultram. *Id*.

15

In May 2009, Dr. Towns indicated Plaintiff had mild to moderate pain with pervasive loss of interest in almost all activities, crying spells, and decreased energy. Tr. 498. She said Plaintiff occasionally had marked difficulties in maintaining social functioning. She said Plaintiff could work for eight hours per day. *Id.* She said Plaintiff could stand for 15 minutes and sit for four hours each at one time, lift up to five pounds, frequently manipulate with her left hand, and occasionally bend, manipulate with her right hand, and needed to occasionally elevate her leg during a workday. Tr. 498–99. She said Plaintiff had moderate pain. Tr. 499. She stated she did not think Plaintiff was able to work between January 2005 and December 2007, but was "unsure because her initial visits at [Dr. Towns'] office began on [August 3, 2007] by another provider and there was no real mention of severity of injury other than it was chronic pain." *Id.* She said the first time she ever saw Plaintiff was on October 13, 2008. *Id.*

3.    Other Evidence

On May 2, 2005, Plaintiff indicated in a Function Report that her daily activities consisted of ensuring that her two minor children got ready for school. Tr. 146. She also indicated she completed all daily household chores such as cleaning, cooking, washing laundry, performing minor yard work, vacuuming, and shopping. *Id.* She indicated she attended PTA meetings and transported her children to and from extracurricular activities. *Id.* She said she required some assistance from her older daughter with her activities, was in constant pain, and could not lie on her right side. Tr. 147. She said she had difficulty dressing, bathing, and grooming. *Id.* She indicated that she prepared simple meals,

including sandwiches or frozen dinners, which took her approximately 20 to 30 minutes depending on the type of meal. Tr. 148. She said she did laundry, dusted with her left hand, and ironed. *Id.* She said she went outside daily, walked, and rode in cars. Tr. 149. She indicated she grocery shopped two to three times per month for approximately 30 minutes. *Id.* She said she read and watched television and talked to family and friends on the phone a few times per week. Tr. 150.

On July 2, 2007, Plaintiff told Kimberly Talbert, a state agency disability examiner, that she did not have any mental problems. Tr. 196. According to Ms. Talbert's notes, Plaintiff said her previous statement, presumably in the disability report appeal, that she had seen doctors for mental problems, was a mistake and the answer to whether she had seen any doctors for mental problems should have been "no." *Id.* On August 6, 2007, Plaintiff told Ms. Talbert she saw Dr. Baker for anxiety and he prescribed Cymbalta, which helped some. Tr. 197. She said she had panic attacks about once or twice per week. *Id.* She said she was not scared to go outside or leave her home. *Id.* She said she could drive, but did not drive very much. *Id.* She said her daughter did most of her grocery shopping for her, but she could go to the store if she needed a few items. *Id.*

C.    The Administrative Hearing

1.    Testimony of Plaintiff and her Daughter

At the hearing, Plaintiff testified she was unable to work due to pain in her right leg, hip, thigh, back, and neck with shoulder pain radiating into her head causing headaches. Tr. 35–37. She reported swelling and intermittent locking of her right knee

and cramping of her right leg occurring three to four times per week. Tr. 42–43. She testified she elevated her legs approximately two times per day when she napped. Tr. 48–49. She reported decreased right grip strength with inability to perform repetitive tasks. Tr. 39–40. She stated that she sometimes fell or stumbled when her leg cramped up. Tr. 43.  She testified that her medications caused sleepiness. Tr. 41. She reported she got nosebleeds approximately twice per month which she attributed to uncontrolled hypertension. Tr. 37. Plaintiff testified that she suffers from depression and fatigue. Tr. 38–39. She stated she could stand for approximately 30 minutes at a time, walk for approximately 30 to 60 minutes, and lift five pounds with her right hand, 10 pounds with her left hand, and 25 pounds with both hands. Tr. 45–47.

Plaintiff's oldest daughter, Adrianne Evans, testified at the hearing. Tr. 50–54. Adrianne is employed at Big Lots where she has been the furniture sales manager for 14 years. Tr. 51–52. She lives approximately 12 miles from her mother and visits her three or four times a week, either on her days off or after work. Tr. 50–51. Adrianne testified that her mother is in constant pain and has to spend a great deal of her time sitting or lying down. Tr. 52–53. Adrianne further testified that the pain medication helps, but that it makes her mother sleepy. Tr. 53. On many of her visits to her mother's home, Adrianne stated that her mother is sitting or lying on her bed with her legs elevated on extra pillows. Tr. 53. Adrianne testified that prior to sustaining the serious injuries from the wreck, her mother would jog, ride bikes, and engage in many activities. Tr. 54.

2.    Testimony of the Vocational Expert ("VE")

VE Carol Crawford also testified at the hearing.  The ALJ asked VE Crawford to assume a hypothetical individual of Plaintiff's age, education, and work experience, who was limited to performing work with the restrictions that require simple, routine tasks in a supervised environment; no required interaction with the public or team-type interaction with co-workers; no lifting or carrying over 20 pounds occasionally or ten pounds frequently; no standing and/or walking over six hours in an eight hour workday; only occassional stooping, twisting, crouching, kneeling, crawling, balancing, or climbing; occasional overhead work with the right dominant arm; no foot pedals or other controls with the right lower extremity; and avoidance of hazards such as unprotected heights, vibration, and dangerous machinery. Tr. at 56. The VE testified such an individual could not perform Plaintiff's PRW as an accounting technician. *Id*. The VE indicated that such an individual could perform the jobs of office helper (1,500 jobs in South Carolina, 142,000 million nationally) or mail clerk (1,200 jobs in South Carolina, 84,000 nationally).  Tr. 57. Upon Plaintiff's counsel's questioning, VE Crawford testified there would not be jobs available for the individual described if medication side effects caused sleeplessness or grogginess such that the individual was unable to work twenty percent of the time.  Tr. 58–59.  The VE also opined no work would be available for an individual with these limitations and the additional limitation of being unable to use the dominant hand in a repetitive fashion.  Tr. 60.  Finally, the VE opined that no jobs would be

available for an individual with the added limitations of having to elevate her leg to hip level for a third of the workday. *Id*.

## II.    Discussion

Plaintiff alleges that the ALJ failed to: (1) give appropriate weight to the opinions of the two treating physicians and the two consultative examining physicians, all of whom concluded that Plaintiff was unable to work; (2) fully develop the record regarding issues on which he placed great importance; (3) consider whether Plaintiff was disabled on her 50th birthday or experienced a closed period of disability following her accident; (4) explain his rationale for his inconsistent findings; and (5) address the effect of Plaintiff's decreased grip strength, her medication, and her long work history. Pl.'s Br. at 1. The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in his decision.

### A.    The ALJ's Findings

In his July 28, 2009 decision, the ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2007.
2. The claimant has not engaged in substantial gainful activity since January 21, 2005, the alleged onset date (20 CFR 404.1520(b), 404.1571 *et seq.*, 416.920(b), and 416.971 *et seq.*).
3. The claimant has the following severe impairments: depression, residuals if right lower extremity fractures, and residuals of open repair for right rotator cuff tear. (20 CFR 404.1520(c) and 416.920(c)).
4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.    After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work except that she is restricted to performance of simple, routine tasks in a supervised environment with no required interaction with the public or "team"-type interaction with co-workers.  She should only occasionally stoop, twist, crouch, kneel, crawl, balance, climb, or work overhead with her right dominant arm.  She should not be required to use foot pedals or other controls with the right lower extremity and should avoid hazards such as unprotected heights, vibration, and dangerous machinery.

6.    The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.    The claimant was born on October 2, 1956 and was 48 years old (defined as a "younger individual") at the time of her alleged onset date, and is now 52 years old (defined as "an individual closely approaching advanced age") (20 CFR 404.1563 and 416.963).

8.    The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules a sa framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1560(c), 404.1566, 416960(c), and 416.966).

11.    The claimant has not been under a disability, as defined in the Social Security Act, from January 21, 2005 through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

Tr. at 3–14.

B.    Legal Framework

1.    The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are "under a disability," defined as:

inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]

42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is working; (2) whether the claimant has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[3] (4) whether such impairment prevents claimant from performing PRW; and (5) whether the impairment prevents the claimant from performing specific jobs that exist in significant numbers in the national economy. *See* 20 C.F.R. § 404.1520, § 416.920. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding

---

[3]The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 404.1525. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, he will be found disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii); § 416.920(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that his impairments match several specific criteria or be "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526; § 416.926; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) and § 416.920(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if she can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); § 416.920(a), (b); Social Security Ruling ("SSR") 82–62 (1982). The claimant bears the burden of establishing her inability to work within the meaning of the Act.  42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy.  To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that she is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981)*; see generally Bowen*, 482 U.S. at 146. n.5 (regarding burdens of proof).

2.     The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party."  42 U.S.C. § 405(g);  § 1383(c)(3) (applying § 405(g) judicial review provisions to SSI matters). The scope of that federal court review is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case.  *See id.*; *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls v. Barnhart*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005).  Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings, and that his conclusion is rational.  *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964).  If there is substantial evidence to support the decision of the Commissioner, that decision must be

affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

    C.    Analysis

        1.    There Was Not Substantial Evidence for the ALJ's Conclusion that Plaintiff Could Stand/Walk Six Hours of an Eight Hour Day

Plaintiff argues that the ALJ did not provide any support for his conclusion that a limitation of light work, including standing and/or walking no more than six hours of an eight hour day is sufficient. The undersigned agrees. Although the ALJ fairly and accurately summarized Plaintiff's medical history from the alleged onset date, he did not set forth substantial evidence in support of his conclusion that Plaintiff could stand or walk six hours of an eight hour day. Specifically, none of the treating, examining, or consulting physicians found that Plaintiff could walk for long periods without significant pain. Additionally, Dr. Dawson, whose opinions the ALJ afforded significant weight, found that Plaintiff could be in pain from long walking and had an absence of reflexes in her right knee and ankle, muscle atrophy of the right lower leg, swelling of the right thigh, and a three centimeter fracture fragment and shortening of the femur bone "which would cause pain when running and long walking." Tr. 446. Although the ALJ states that his restriction of light work is consistent with Dr. Dawson's findings, he does not address how his restriction of no walking and/or standing longer than six out of eight hours is consistent with Dr. Dawson's finding that long walking would cause Plaintiff pain. Nor does the ALJ point to other substantial evidence in the record to support his conclusion. Therefore, the undersigned recommends reversal and remand on this basis.

2.    The ALJ Was Not Required to Consider Whether Plaintiff was Disabled as of her 50th Birthday or Experienced a Closed Period

Plaintiff argues that, contrary to the Commissioner's finding, the evidence demonstrates that she was limited to sedentary work and was therefore disabled on her 50th birthday.   Plaintiff's argument relies on the assumption that she is limited to sedentary work, which is contrary to the decision of the ALJ and is therefore not ripe for review. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 2, Rule 201.14 (the Grid Rule for someone 50 years old (closely approaching advanced age) who is limited to sedentary work, would ordinarily indicate a finding of "disabled" absent a showing of transferable skills to the sedentary level). However, in light of the undersigned's recommendation of reversal and remand on other grounds, it is also recommended that the Commissioner be directed to determine on remand whether Plaintiff was disabled on her 50th birthday.

Plaintiff also argues that the ALJ should have considered whether a closed period of disability was appropriate.   However, there is no indication from the evidence in the record that a closed period of disability should have been considered.   To be disabled under the Act, an individual must show that her impairments prevented her from performing any substantial gainful activity for 12 consecutive months. See 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).   Plaintiff's alleged onset date is January 21, 2005.   On October 18, 2005, Dr. Mendes found Plaintiff had full active range of motion in her right shoulder, no internal and external rotation contracture, and normal subscapularis lift off test. Tr. 404. He found the compounding wound in the posterior aspect of her right ankle had healed without difficulty. *Id*. She had a healed skin graft, normal range of motion in

26

her hip and ankle, and a one-half inch limb length discrepancy. *Id*. She lacked about 30 degrees of terminal supination in her right forearm, but had normal elbow flexion, extension, and pronation. *Id*. Shoulder x-rays showed suture anchors used to repair her massive rotator cuff avulsion without evidence of complication. *Id*. X-rays showed right femur segmental and right tibial shaft fractures. *Id*. X-rays of Plaintiff's right forearm showed a solid union of the right radius shaft fracture. *Id*. Dr. Mendes diagnosed a healed right shoulder rotator cuff repair and prescribed a one-half inch shoe lift. *Id*. He noted that no further treatment was required and gave no activity restrictions. *Id*. Therefore, the undersigned submits that the evidence in the record does not indicate that a closed period of disability was appropriate under these facts.

      3.      The ALJ Did Not Err in His Consideration of the Opinions of Plaintiff's Treating Physicians or Dr. Harley

      a.      Treating Physicians

Plaintiff argues that the ALJ erred by not giving appropriate weight to the opinions of Drs. Mendes and Towns. Plaintiff points out that Dr. Mendes's March 9, 2005 office note states "Total disability continues indefinitely" and his July 19, 2005 office note states "based on her multiple injuries[,] I support her application for permanent disability." Tr. 409, 405. Plaintiff argues that the ALJ gave inappropriate weight to Dr. Towns's opinion in response to a question asking whether Plaintiff was able to work eight hours per day, five days per week at any time since her December 31, 2007 accident. Dr. Towns responded, "I don't think she was able to but I am unsure" because she did not assume Plaintiff's medical care until October 13, 2008. Tr. 499.

27

If a treating source's medical opinion is "well-supported and 'not inconsistent' with the other substantial evidence in the case record, it must be given controlling weight[.]" SSR 96-2p; *see also* 20 C.F.R. § 416.927(d)(2) (providing treating source's opinion will be given controlling weight if well-supported by medically-acceptable clinical and laboratory diagnostic techniques and inconsistent with other substantial evidence in the record); *see also Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996) (finding a physician's opinion should be accorded "significantly less weight" if it is not supported by the clinical evidence or if it is inconsistent with other substantial evidence). The Commissioner typically accords greater weight to the opinion of a claimant's treating medical sources because such sources are best able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. *See* 20 C.F.R. § 416.927(d)(2). However, "the rule does not require that the testimony be given controlling weight." *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992) (per curiam). Rather, "[c]ourts evaluate and weigh medical opinions pursuant to the following non-exclusive list: (1) whether the physician has examined the applicant, (2) the treatment relationship between the physician and the applicant, (3) the supportability of the physician's opinion, (4) the consistency of the opinion with the record, and (5) whether the physician is a specialist." *Johnson*, 434 F.3d at 654; 20 C.F.R. § 416.927(d). The rationale for the general rule affording opinions of treating physicians greater weight is "because the treating physician has necessarily examined the applicant and has a treatment relationship with the applicant." *Johnson*, 434 F.3d at 654 (*quoting Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001)). The ALJ has the

discretion to give less weight to the opinion of a treating physician when there is "persuasive contrary evidence." *Mastro*, 270 F.3d at 176. Further, in undertaking review of the ALJ's treatment of a claimant's treating sources, the court focuses its review on whether the ALJ's opinion is supported by substantial evidence, because its role is not to "undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]." *Craig*, 76 F.3d at 589.

Having reviewed the record, the undersigned finds the ALJ appropriately considered Dr. Mendes's opinion. The ALJ examined Dr. Mendes's support for Plaintiff's application for permanent disability, but he discounted the opinion because he found it lacked specificity, was unsupported by Dr. Mendes's own findings, and is an opinion on an issue reserved to the Commissioner. Tr. 11. As required, the ALJ provided detailed reasons why he gave Dr. Mendes's opinion little weight on the question of disability. Tr. 22.

For example, the ALJ explained that there is no evidence that Dr. Mendes has knowledge of or training in Social Security Law and Regulations. *Id.* For this reason, the ALJ did not give Dr. Mendes's opinion on the ultimate question of disability controlling weight. *Id.* However, the ALJ also indicated that he gave Dr. Mendes's statement of support little weight because it was not supported by his own progress reports. Additionally, the ALJ noted that Dr. Mendes did not specify what limitations Plaintiff's "multiple impairments" caused. *Id.* Therefore, the ALJ did not improperly disregard Dr.

Mendes's opinions, but simply gave his opinion on the ultimate question of disability little weight.

Plaintiff also complains that the ALJ did not give appropriate weight to Dr. Towns's opinion that Plaintiff could not work an eight hour day, five days a week since December 31, 2007. However, Dr. Towns actually indicated that she was unable to opine with certainty regarding Plaintiff's ability to work before she began seeing Plaintiff on October 13, 2008. Dr. Towns indicated that the records from the previous provider did not mention the severity of the injury. Tr. 499. Additionally, the ALJ relied on Plaintiff's own testimony with regard to the amount of weight she could lift. Tr. 23. Therefore, the ALJ did not err in considering the opinion of Dr. Towns.

b.    Dr. Harley

Plaintiff argues that the ALJ improperly gave little weight to the conclusions of Dr. Harley. Dr. Harley diagnosed Plaintiff with major depression, physical limitations due to the motor vehicle collision with orthopaedic injuries, and hypertension. Tr. 458–59. He assigned her a GAF of 37. Tr. 459. A GAF below 40 indicates a severely-impaired individual for whom work should be completely out of the question. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* (4th ed., text revision 2000) at 34. He concluded that Plaintiff had a major impairment in her ability to function vocationally and a major impairment in her ability to function socially from a general psychiatric standpoint. *Id.* However, the ALJ found that the basis for Dr. Harley's assessment was unclear. Tr. 23. Dr. Harley's examination showed Plaintiff was

fully oriented with good memory, adequate thought organization, physiologic action, and normal emotions throughout the interview. *Id.*; *See Krogmeier v. Barnhart*, 294 F.3d 1019, 1023 (8th Cir.2002) ("When a treating physician's opinions are inconsistent or contrary to the medical evidence as a whole, they are entitled to less weight") (citations omitted); *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964) (court scrutinizes the record as a whole to determine whether the conclusions reached are rational); *see also Lee v. Sullivan*, 945 F.2d 687, 692 (4th Cir. 1991) (ALJ not required to include limitations or restrictions in his decision that he finds are not supported by the record). While he noted she had numerous worries throughout her interview, he also noted she drove, cooked, shopped, visited her daughter often, and was able to communicate. Tr. 457–59. Additionally, as the ALJ noted, just one month prior to Dr. Harley's examination, Plaintiff denied any type of emotional or mental problems. Tr. 23, 196. Further, a couple of weeks after Dr. Harley's examination, Dr. Baker found that Plaintiff had "improving" depressive disorder. Tr. 492–93. As the ALJ noted, more recent evidence, including the treatment records of Dr. Towns, showed Plaintiff failed to take antidepressant medications as prescribed. Tr. 23, 480–84, 486–88. Therefore, the undersigned submits that the ALJ provided substantial evidence for apportioning little weight to the opinions of Dr. Harley.

### 4.    The ALJ Did Not Err by Failing to Develop the Record

Plaintiff claims the ALJ placed great importance on, but failed to fully develop the record regarding: (1) the absence of medical records for Plaintiff from October 18, 2007

until October 13, 2008; and (2) a Report of Contact dated July 2, 2007, Tr. 196, indicating Plaintiff reported that she had no mental problems.

Although Plaintiff argues that the ALJ placed considerable importance on this evidence, it appears both the absence of medical records for one year and the Report of Contact were considered by the ALJ in the larger context of Plaintiff's medical records. The ALJ is required to seek additional evidence when the evidence submitted by the Plaintiff is inadequate. *See* 20 C.F.R. § 416.912(e) ("We will seek additional evidence or clarification from your medical source when the report from your medical source contains a conflict or ambiguity that must be resolved, the report does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques."). However, there is no evidence that the medical records submitted by Plaintiff were inadequate. Only a "reasonably complete" record is required. *Bell v. Chater*, 57 F.3d 1065 (4th Cir. 1995). Plaintiff in this case was represented by counsel, and she does not allege that specific medical records exist which would assist the ALJ in examining the case. Additionally, although the ALJ noted the Report of Contact in his discussion of the Plaintiff's emotional problems, and particularly its contrast to Dr. Harley's analysis a month afterward, he did not indicate that he placed greater weight on it than any other evidence. Tr. 23. Therefore, on the basis of the above analysis, the undersigned submits that the ALJ was not required to more fully develop the record.

5.     The ALJ's Consideration of the Effects of Plaintiff's Grip Strength,
Medication, and Work History Was Not Improper

Plaintiff argues that the ALJ failed to consider the effects of Plaintiff's grip strength, medication, and work history.    However, the ALJ expressly mentioned Plaintiff's allegations of decreased right grip strength and medication side effects in his description of her subjective complaints. Tr. 16. In his summary of the evidence, he noted that she could perform both fine and gross movements. Tr. 17–18.   The ALJ also considered Plaintiff's allegations of reduced right grip strength in the context of evaluating Dr. Towns's opinions. The ALJ expressly considered Dr. Towns's statement that Plaintiff could only occasionally manipulate with her right hand. Tr. 22–23. He noted "[h]er right upper extremity show[ed] good strength and fairly good mobility. [Plaintiff] demonstrated capacity for fine and gross movements and the record d[id] not contain findings which would indicate limited manipulation capacity with her right hand." *Id*.  In so doing, he noted evidence of good strength and mobility with good healing of her fractures and good results from her shoulder surgery. He also noted Plaintiff's activities of daily living. Tr. 22–23. The ALJ also considered the effects of Plaintiff's medicine and found that her "medications contraindictate work that would expose her to hazardous situations such as unprotected heights, vibration, and dangerous machinery." Tr. 24. Finally, the ALJ was not required to consider the duration of Plaintiff's previous employment in order to make a determination of whether she is disabled. Therefore, the ALJ did not err in considering the effect of Plaintiff's grip strength, medication, and duration of her work history.

III.    Conclusion

Based on the above, the undersigned recommends that the Commissioner's decision be reversed and remanded pursuant to sentence four of 42 U.S.C. § 405(g) for further administrative action as set out herein.

IT IS SO RECOMMENDED.

December 22, 2011                              Shiva V. Hodges
Florence, South Carolina                      United States Magistrate Judge

**The parties are directed to note the important information in the attached
"Notice of Right to File Objections to Report and Recommendation."**